# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 10, 2022

Lyle W. Cayce
Clerk

No. 20-40284

YVES WANTOU,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

WAL-MART STORES TEXAS, L.L.C.,

*Defendant—Appellee/Cross-Appellant*.

Appeal from the United States District Court
for the Eastern District of Texas,
USDC No. 5:17-cv-00018

Before STEWART, HO, and ENGELHARDT, *Circuit Judges*.

KURT D. ENGELHARDT, *Circuit Judge*:

Both parties appeal certain rulings by the district court relative to the claims asserted by Plaintiff–Appellant/Cross-Appellee Yves Wantou against Wal-Mart Stores Texas, L.L.C., under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., 42 U.S.C. § 1981a, and Texas law. We AFFIRM.

No. 20-40284

I.

Wantou, a pharmacist and black man from Cameroon, West Africa, filed suit against his former employer, Wal-Mart, contending that Wal-Mart intentionally subjected and/or allowed him to be subjected to discrimination based on race, color, and national origin, illegal harassment, and a hostile work environment. Wantou additionally claims that Wal-Mart retaliated against him for complaining about discrimination and asserting his rights. Specifically, Wantou's suit challenges his termination from employment, three written "coachings" (formal workplace disciplinary actions) that he received while employed by Wal-Mart, a threat of demotion, and Wal-Mart's alleged failure to pay him for approximately 24 hours of work. Based on these assertions, Wantou has requested relief in the form of back pay, front pay, compensatory damages, punitive damages, attorney's fees, and restitution under quantum meruit for unpaid work.

In the district court, all of Wantou's claims were dismissed by summary judgment except for his Title VII retaliation claims and his quantum meruit claim. The remaining claims were presented to a jury in October 2019. The jury rejected all but one claim—regarding the third coaching—for which it awarded $75,000 in punitive damages. The jury also provided an advisory verdict recommending an award of $32,240 in back pay and $0 in front pay. Post-trial, the district court entered judgment in favor of Wantou as to the third coaching, awarding $75,000 in punitive damages but only $5,177.50 as back pay. Attorney's fees also were awarded under 42 U.S.C. § 1988(b) to Wantou as a prevailing party.

On appeal, Wantou challenges the jury's rejection of his Title VII retaliation claims regarding his termination and first and second coachings, and the jury's failure to award compensatory damages or restitution for unpaid work and other benefits. Wantou also contests the district court's

front and back pay awards, the summary judgment dismissal of his discrimination and hostile work environment claims, and a number of the district court's rulings regarding proposed jury instructions, the admission of evidence, and limitations on trial time. Wal-Mart appeals all aspects of the district court's judgment and post-judgment rulings that are favorable to Wantou, in addition to arguing that punitive damages, if awarded, should be remitted to no more than $10,355.

## II.

In this appeal, we are tasked with reviewing the district court's final judgment and rulings on the parties' motions asserted pursuant to Rules 49, 50, 51, 56, and 59 of the Federal Rules of Civil Procedure. Summary judgments rendered pursuant to Rule 56(b) are reviewed de novo, "'applying the same standard that the district court applied.'" *Aggreko, L.L.C. v. Chartis Specialty Ins. Co.*, 942 F.3d 682, 687 (5th Cir. 2019) (quoting *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016)). "We may affirm the district court's grant of summary judgment on any ground supported by the record and presented to the district court." *Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.*, 784 F.3d 270, 273 (5th Cir. 2015).

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Material facts are those that "might affect the outcome of the suit under the governing law." *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 456 (5th Cir. 2003) (internal quotation marks and citation omitted). "A genuine [dispute] of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017). All facts and reasonable inferences are construed in favor of the nonmovant, and the court should not weigh evidence or make credibility

findings. *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009). The resolution of a genuine dispute of material fact "is the exclusive province of the trier of fact and may not be decided at the summary judgment stage." *Ramirez v. Landry's Seafood Inn & Oyster Bar*, 280 F.3d 576, 578 n.3 (5th Cir. 2002).

Although Wantou's claims were presented to a jury, the jury's determinations regarding back pay and front pay are, in this context, only advisory. That is, back pay and front pay are equitable remedies determined by the court. *See* 42 U.S.C. § 1981a(b)(2), (c). Thus, we review the district court's findings of fact for clear error and legal issues de novo. *Gebreyesus v. F.C. Schaffer & Assocs., Inc.,* 204 F.3d 639, 642 (5th Cir. 2000) (following a bench trial, we review the findings of fact for clear error and the legal issues de novo). "[F]actual findings made under an erroneous view of controlling legal principles are reviewed de novo." *Walker v. Braus*, 995 F.2d 77, 80 (5th Cir. 1993).

A finding of fact is clearly erroneous "when, although there is evidence to support it, the reviewing court, based on all the evidence, is left with the definitive and firm conviction that a mistake has been committed." *Gebreyesus*, 204 F.3d at 642; *see also Anderson v. City of Bessemer,* 470 U.S. 564, 573 (1985). Importantly, "[t]his standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson*, 470 U.S. at 573.

Regarding the jury's verdict, both parties moved for judgments as a matter of law or, in the alternative, a new trial. After a party has been fully heard on an issue during a jury trial, judgments as a matter of law are appropriately rendered by the court only when "a reasonable jury would not have a legally sufficient evidentiary basis to find for a party on [an] issue."

Fed. R. Civ. P. 50(a). We review de novo the district court's ruling on a motion for judgment as a matter of law, applying the same legal standard as the trial court. *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001). "[W]e consider all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." *Id.* (quoting *Brown v. Bryan Cnty.*, 219 F.3d 450, 456 (5th Cir. 2000)). Although our review is de novo, we recognize that "our standard of review with respect to a jury verdict is especially deferential." *Id.* Thus, a Rule 50 motion must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id.* (internal quotation omitted). We reverse the denial of a Rule 50 motion only if the jury's factual findings are unsupported by substantial evidence or "the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 614 (5th Cir. 2018) (citation omitted).

After a jury trial, Rule 59 of the Federal Rules of Civil Procedure authorizes courts to grant motions for new trial for any reason for which a new trial has heretofore been granted in an action at law in federal court. Fed. R. Civ. P. 59. After a nonjury trial, Rule 59 allows new trials for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court. *Id.* The district court's exercise of discretion in denying a motion for new trial or remittitur "can be set aside only upon a clear showing of abuse." *Eiland v. Westinghouse Elec. Corp.,* 58 F.3d 176, 183 (5th Cir. 1995); *see also Abner v. Kansas City S.R.R. Co.*, 513 F.3d 154, 157 (5th Cir. 2008).

When reviewing a jury's conclusions, "we are bound to view the evidence and all reasonable inferences in the light most favorable to the jury's determination." *Rideau v. Parkem Indus. Servs., Inc.,* 917 F.2d 892, 897 (5th Cir. 1990). We defer to jury verdicts and interpret them "most favorabl[y] to

upholding the jury's decision by a finding of consistency." *Merritt Hawkins & Assocs., L.L.C. v. Gresham*, 861 F.3d 143, 154 (5th Cir. 2017). We will reverse the denial of a motion for new trial "only when there is an absolute absence of evidence to support the jury's verdict." *Williams,* 898 F.3d at 614 (citation omitted). "However, when this court is left with the perception that the verdict is clearly excessive, deference must be abandoned." *Eiland,* 58 F.3d at 183. When "defects in the award are readily identifiable and measurable," remittitur ordinarily is appropriate. *Matter of 3 Star Props., L.L.C.*, 6 F.4th 595, 613 (5th Cir. 2021) (quoting *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 179 (5th Cir. 1992)). Constitutional challenges to the size of the punitive damages award are reviewed de novo. *Lincoln v. Case,* 340 F.3d 283, 294 (5th Cir. 2003) (citing *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436 (2001)).

Challenges to jury instructions are governed by Rule 51 of the Federal Rules of Civil Procedure. We "review challenges to jury instructions for abuse of discretion and afford the trial court great latitude in the framing and structure of jury instructions." *Young v. Bd. of Supervisors,* 927 F.3d 898, 904 (5th Cir. 2019) (citation omitted). "Verdict forms are considered part of the jury instruction," *United States v. Fairley,* 880 F.3d 198, 208 (5th Cir. 2018), and we consider them "in light of the entire jury instruction." *Jones v. United States,* 527 U.S. 373, 393 (1999) (citation omitted). We ask not whether the court gave "every correct instruction offered by the parties," but rather whether it "correctly and adequately instruct[ed] the jury as to the law to be followed in deciding the issues." *Alexander v. Conveyors & Dumpers, Inc.,* 731 F.2d 1221, 1227 (5th Cir. 1984) (per curiam). "[T]he party challenging the instruction must demonstrate that the charge as a whole creates substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Young,* 927 F.3d at 904 (citation omitted). An error not preserved as required by Rule 51(d)(1) of the Federal Rules of Civil

Procedure may be considered if the error is plain and affects substantial rights.  *See* Fed. R. Civ. P. 51(d).

Finally, we review the district court's evidentiary rulings for abuse of discretion. *Wallace v. Andeavor Corp.,* 916 F.3d 423, 428 (5th Cir. 2019) (citations omitted). "A trial court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.*  "[T]o vacate a judgment based on an error in an evidentiary ruling, 'this court must find that the substantial rights of the parties were affected.'" *Seatrax, Inc. v. Sonbeck Int'l, Inc.,* 200 F.3d 358, 370 (5th Cir. 2000) (quoting *Carter v. Massey-Ferguson, Inc.,* 716 F.2d 344 (5th Cir. 1983)).

## III.

The factual and procedural background of this matter, along with all contested issues, competing arguments, and substantive legal principles, is more than adequately set forth in the parties' extensive briefs and the district court's written rulings.  Indeed, the district court has generated three lengthy written rulings laboriously recounting the parties' motions, arguments, pertinent evidence, and applicable law. The September 30, 2019 order devotes 128 pages to discussion of the summary judgment issues and rulings, whereas the 36-page March 12, 2020 order and 20-page July 6, 2020 order address the parties' initial and second round of post-trial motions.

Given this detailed record, we need not parse each of the parties' many assertions made on appeal. Rather, having carefully reviewed the parties' briefs, the record, and applicable law, we agree in large part with the district court's assessment.  Thus, we shall limit our additional comments herein to only those areas for which elaboration or modification is truly warranted.

No. 20-40284

A. Hostile Work Environment

Beginning with the district court's summary judgment dismissal of Wantou's hostile work environment claim, Wantou and the Equal Employment Opportunity Commission ("EEOC"), as *amicus curiae,* contend the district court misstated and misapplied the applicable legal standard for an actionable hostile work environment claim under Title VII. In addition to protecting employees from race, sex, and national origin discrimination in the workplace, Title VII also makes it unlawful for employers to require "people to work in a discriminatorily hostile or abusive environment." *Gardner v. CLC of Pascagoula, L.L.C.,* 915 F.3d 320, 325 (5th Cir. 2019) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 106 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)).

To survive summary judgment on a hostile work environment claim, a plaintiff must show that (1) he is a member of a protected class; (2) he suffered unwelcomed harassment; (3) the harassment was based on his membership in a protected class; (4) the harassment "affected a term, condition, or privilege of employment"; and (5) "the employer knew or should have known" about the harassment and "failed to take prompt remedial action." *West v. City of Houston,* 960 F.3d 736, 741–42 (5th Cir. 2020) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). For harassment to affect a term, condition, or privilege of employment, it "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* The environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in

fact did perceive to be so." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998) (citing *Harris,* 510 U.S. at 21–22)).

The totality of the employment circumstances determines whether an environment is objectively hostile. *Harris,* 510 U.S. at 23. Although no single factor is determinative, pertinent considerations are: (1) "the frequency of the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interferes with an employee's work performance." *Id.* "Title VII, however, is not a 'general civility code.'" *Faragher,* 524 U.S. at 788 (internal quotation marks and citation omitted). Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.*

Arguing that Wantou's deposition testimony identified pervasive comments related to his race and national origin that were both insulting and humiliating, Wantou and the EEOC contend that the district court erroneously required Wantou to establish conduct by his co-workers that was severe *and* pervasive rather than severe *or* pervasive. We have noted that "the test—whether the harassment is severe or pervasive—is stated in the disjunctive." *Lauderdale v. Tex. Dep't of Crim. Just.,* 512 F.3d 157, 163 (5th Cir. 2007). "An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment." *Id.* (citing *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 434–35 (5th Cir. 2005)). "The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists." *Id.* Thus, "the required showing of severity or seriousness of the harassing

conduct varies inversely with the pervasiveness or frequency of the conduct." *Id.* (quoting *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991)).

Wantou and the EEOC also maintain that the district court wrongly emphasized that "the incidents [asserted by Wantou] involved no physical threat," thus suggesting that factor is of special importance in determining whether conduct is "severe" and, in doing so, ignoring that "likening a black person to an animal is an especially heinous form of harassment." *Abner*, 513 F.3d at 168 & n.74; *see also Henry v. CorpCar Servs. Hous. Ltd.*, 625 F. App'x 607, 612 (5th Cir. 2015); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007). On this latter point, Wantou testified (at his deposition) that three Caucasian pharmacy technicians (Ann Samples, Rayla Edwards, and Wendy Willoughby) "continuously" called him "chimp" or "monkey." And, they made "a lot of comments" about Wantou's negative reaction to flies being in the pharmacy, telling him that Africa was "probably fly-infested" and "a dirty place," so he should just deal with it. They also "constantly" mimicked and mocked Wantou's accent, which was especially offensive because it occurred in front of customers. Wantou additionally contends that Shawn Shannon—another Wal-Mart pharmacist—emboldened and amplified the co-workers' harassment by calling Wantou an "African fart" and "you little African" on "multiple" occasions. Furthermore, Shannon eventually stopped speaking to Wantou altogether, making it harder for Wantou to do his job.

We agree that physical threats are not "indispensable elements" of a hostile work environment claim. As we have stated before, the test considers the totality of the circumstances. And the comments that Wantou attributes to his co-workers are unquestionably reprehensible. Were this the only evidence before us, we likely would vacate and remand the district court's summary judgment relative to Wantou's hostile work environment for

further consideration in light of the principles discussed herein. On the instant record, however, we do not think that necessary here.

We reach this conclusion because of the fifth requirement for an actionable hostile work environment claim, i.e., that "the employer knew or should have known" about the harassment and "failed to take prompt remedial action." The EEOC's amicus brief does not focus on this requirement and Wantou's assessment regarding this question relative to the aforementioned offensive comments is scant. Our own review of the record reveals multiple references to co-workers' offensive comments in Wantou's deposition testimony. On the other hand, the same frequency and specificity is not true of Wal-Mart's documentation or the written statements that Wantou provided to Wal-Mart in connection with his various complaints to the company.

Among those documents is an October 1, 2015 email from Wantou to Wal-Mart Market Health and Welfare Director Steven Williams. Wantou references Shawn Shannon's not talking to him after September 23, 2015, except for "violent language or insults in [a] totally unprofessional manner and in front of techs," and accuses Shannon of "colluding with some of the techs to bully, mob, harass him and create a hostile work environment." In the same document, Wantou characterizes co-worker Rayla Edwards as "notorious in her harassment and constant bullying behavior towards me," and states that the climate negatively impacts work performance, morale, and customer service.

Interview documentation completed by Williams in the course of the investigation that he began in November 2015 references Samples' admitted remarks about flies and Africa, as well as the admonition that Samples received from then-Pharmacy Manager Pascal Onyema about such comments, and her own contention that she, a "world traveler," "didn't

mean anything" by her comment. A reference to Ebola by a co-worker also is mentioned.

A statement prepared by Wantou, dated November 22, 2015, contends that Shawn Shannon is routinely treated more favorably by Caucasian pharmacy techs, who give Shannon "full support, while being hostile and uncooperative" to Wantou and "turning a blind eye to Shannon's shortcomings." Wantou also describes Shannon as "on occasion, verbally violent, unprofessional, [using] insulting language; [and] contributing to a divide along racial lines by colluding with most of the Caucasian technicians . . ., to bully, [], and harass me," whereas [pharmacy tech] Rayla Edwards "[is] notorious in her harassment and constant bullying behavior," "routinely yells at me," and "displays aggressive behavior towards me."

The record also includes an email that Wantou sent to himself on June 28, 2015, which references co-worker Ann Samples' comment about flies and Africa, and states that, another time, Samples said to Wantou: "You like to work like a dog, or a monkey rather." That comment likewise appears in a written statement that Wantou submitted to Williams on November 22, 2015, in connection with the investigation that Williams was conducting at the time. In that statement, Wantou adds that he experiences slurs regarding race, color, and national origin. *Id.* Finally, in his December 6, 2015 Global Ethics complaint, Wantou identifies co-worker Rayla Edwards as the most notorious harasser/bully, followed by Ann Samples, and references the impact that the hostile climate has on morale and work performance.

Based on this documentation, it is evident that workplace relations at the Wal-Mart pharmacy at which Wantou worked were hardly copacetic throughout his employment. Importantly, however, it is not apparent that offensive racist comments and conduct of the sort highlighted in the EEOC's brief and Wantou's deposition testimony continued after the investigation

and instruction provided by Wal-Mart managerial personnel, in late 2015, in response to Wantou's complaint to management. Furthermore, on April 25, 2016, both Wantou and fellow pharmacist Shawn Shannon received a written coaching by Wal-Mart Interim Market Health and Welfare Director Damon Johnson for not maintaining communication as they had previously been instructed to do.  And, according to Pharmacy Manager Katie Leeves, she also met with Wantou, Shannon, and the pharmacy technicians, on April 26, 2016, to restate the requirement that all personnel act professionally in the pharmacy.

In all, based on this limited evidentiary showing, it is not evident that a triable dispute exists relative to whether Wal-Mart remained aware that Wantou suffered continued harassment and "failed to take prompt remedial action." Thus, given this additional determination regarding Wantou's hostile work environment claim, we find no reversible error in the district court's summary judgment ruling in Wal-Mart's favor.

B. Jury Instructions

Focusing next on jury instructions, Wantou maintains the district court erred in failing to include his proposed "Cat's Paw" instructions in the court's instructions to the jury. "[T]he district court's refusal to give a requested jury instruction constitutes reversible error only if the instruction (1) was a substantially correct statement of law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the party's ability to present a given claim." *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 578 (5th Cir. 2004). A court's refusal to give a jury instruction constitutes error "only if there [is] . . . sufficient evidence to support the instruction." *Jackson v. Taylor,* 912 F.2d 795, 798 (5th Cir. 1990).

Here, the district court concluded Wantou did not come forward with sufficient evidence to support a "Cat's Paw" causation instruction. If we were to consider the question in the first instance, we might find no harm in providing a Cat's Paw instruction. A plaintiff asserting a Title VII *discrimination* claim must show only that the employer's discriminatory motive "was a motivating factor" for an adverse employment action. *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015). In *University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. 338, 362 (2013), however, the Supreme Court clarified that a plaintiff asserting a Title VII *retaliation* claim must meet a higher standard of causation. Such a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* In *Zamora*, we confirmed that that the Cat's Paw analysis remains viable in the context of the but-for causation required for Title VII retaliation claims. 798 F.3d at 332–33; *see also Brown v. Wal-Mart Stores East,* L.P., 969 F.3d 571, 577 (5th Cir. 2020).

"Plaintiffs use a [C]at's [P]aw theory of liability when they cannot show that the decisionmaker—the person who took the adverse employment action—harbored any retaliatory animus." *Zamora,* 798 F.3d at 331. Thus, under the Cat's Paw theory, a plaintiff must establish that the person with a retaliatory motive caused the decisionmaker to take the retaliatory action. *Id.* "Put another way, a plaintiff must show that the person with retaliatory animus used the decisionmaker to bring about the intended retaliatory action." *Id.*

Nevertheless, we find no abuse of discretion by the district court. To start, Wantou's proposed instructions, as written, are confusing if not, as the district court concluded, internally inconsistent. And one proposed instruction referred to "discriminatory bias" and "discriminatory animus" at various times, despite the district court's grant of summary judgment on all claims of discrimination. In any event, Wantou's ability to present and argue

his retaliation claim to the jury was not seriously impaired by the district court's ruling.

Through the presentation of evidence, Wantou connected persons and evidence. And in closing argument, Wantou freely discussed the roles and alleged motives of the various actors, and was not limited in attributing those actions and motivations to Wal-Mart, who is the sole defendant. Consistent with Wal-Mart's disciplinary process and the complexity of Wantou's allegations, the instruction did not identify specific decisionmakers. "Defendant Wal-Mart" could capture each co-worker or supervisor covered in Wantou's requested instruction. Given this wording, Wantou was able to argue about the retaliatory animus of his co-workers, and assert that animus resulted in various adverse employment actions. Indeed, Wantou was able to provide his full story in closing and present all of his arguments to the jury without objection. Accordingly, we find no error in the district court's refusal to provide the specific Cat's Paw instructions that Wantou requested.

## C. Jury Verdict—Sufficiency of the Evidence

To establish a claim of retaliation under Title VII or Section 1981, a plaintiff must prove by a preponderance of the evidence that: (i) he engaged in a protected activity; (ii) an adverse employment action occurred; and (iii) a causal link exists between the protected activity and the adverse employment action. *Washburn v. Harvey,* 504 F.3d 505, 510 (5th Cir. 2007). The burden of production then shifts to the defendant to articulate a legitimate, nonretaliatory reason for the alleged retaliatory action. *Id.* If the defendant satisfies this burden, the plaintiff must offer sufficient evidence that the proffered reason is a pretext for retaliation. *Septimus v. Univ. of Houston,* 399 F.3d 601, 608 (5th Cir. 2005); *Gee v. Principi,* 289 F.3d 342, 345, 347 (5th Cir. 2002). Under this framework, the employee's ultimate burden is to prove that the adverse employment action would not have occurred but for the

protected conduct. *Brown,* 969 F.3d at 577. Even if a plaintiff's protected conduct is a substantial element in a defendant's adverse employment action, no liability for unlawful retaliation arises if the employee would have faced that discipline even without the protected conduct. *See Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996).

As the district court reasoned, sufficient conflicting evidence exists to support the jury's verdict regarding the merits of Wantou's retaliation claims. Although we might reach a different result if we considered the claim in the first instance, that is not the role of the appellate court.  Rather, the record reflects that the jury was presented with all relevant evidence (including live witness testimony), heard arguments by counsel, and received the necessary instruction regarding applicable law by the district court. And, in the end, the jury's assessment, including its credibility determinations, favored Wantou regarding the third (June 28, 2016) coaching, and Wal-Mart regarding the first and second coachings, as well as Wantou's termination. In short, we cannot say the jury's verdict is against the great weight of the evidence or that a reasonable person could only have reached an opposite decision.  Nor has reversible legal error been identified.

Particularly regarding the third coaching, enough evidence exists to allow the jury to conclude, despite Pharmacy Manager Katie Leeves' protests to the contrary, that Leeves was sufficiently aware of Wantou's various ethics complaints (submitted by means of Wal-Mart's Global Ethics Hotline), and complaints of race discrimination, when she issued the June 28, 2016 (third) coaching, and that the coaching would not have occurred but for those complaints.[1]  Particularly pertinent here, we again emphasize the applicable

---

[1] For instance, an addendum to Wantou's formal complaint (dated June 29, 2016) represents that, on June 27, 2016, the day before the third coaching, Wantou telephoned Pharmacy Manager Katy Leeves (who was away from the pharmacy) to "complain, once

No. 20-40284

standard of review and that the jury, as the trier of fact, is charged with making credibility determinations based on testimony and other evidence presented it.    That is, a Rule 50 motion must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Flowers*, 247 F.3d at 235.  Thus, we find no reason to set aside the judgment of the district court and the jury's verdict relative to this claim.

### D. Jury Verdict Form—Inconsistencies and Back Pay Award

Although we appreciate the logic of Wantou's assertions, we are not persuaded that the jury's responses to Questions 4 and 6, or the responses to Questions 4 and 7.3, of the verdict form are inconsistent.  Both Questions 4 and 6 relate to whether Wantou was retaliated against, and the answer to Question 7 provides the jury's advisory verdict regarding back pay:

> **QUESTION 4**: Do you find that Plaintiff Wantou would not have been issued a written coaching on June 28, 2016 but for his good-faith, reasonable ethics complaints based on race, color or national origin discrimination by way of Defendant Wal-Mart's Global Ethics Hotline?
>
> Answer "Yes" or "No."
>
> YES
>
> **QUESTION 6**: Do you find that Plaintiff Wantou would not have been terminated but for his good-faith, reasonable ethics complaints based on race, color or national origin discrimination by way of Defendant Wal-Mart's Global Ethics Hotline?

again, about the disparate treatment on the part of the technicians and the cashiers due to [his] race, [his] color, and [his] national origin." The same document accuses Leeves of "not affording [him] the right to complain, and retaliating against him whenever [he] complain[s]."

No. 20-40284

Answer "Yes" or "No."

NO

**QUESTION 7**: What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff Wantou for the damages, if any, you have found Defendant Wal-Mart caused Plaintiff Wantou?

3. Wages and benefits from November 9, 2016 to November 5, 2019.

$32,240.00

Regarding Questions 4 and 6, Wantou argues that Wal-Mart conceded that he was fired for "Misconduct with Coachings," such that the third written coaching was a prerequisite to Wantou's termination. From this, Wantou maintains, because the jury found his third written (June 28, 2016) coaching retaliatory, and the third written coaching was a but for cause of his termination, his termination was retaliatory. Thus, Wantou argues, the jury could not have answered Question 6 in the negative. Relatedly, Wantou contends, if his termination was retaliatory, the jury should have awarded full back pay. As the district court reasoned, however, the jury's answers to Questions 4, 6, and 7 are reconcilable.

Wantou's argument rests on his assertion that his third written coaching was necessary for his termination. However, as the district court concluded, a reasonable jury could disagree. Record evidence suggests that that Wal-Mart's coaching levels are a guideline rather than a strict hierarchy. Indeed, Wantou's second written coaching informed him that the next level of action (if behavior continued) is "Third Written up to and including Termination." Additionally, Wal-Mart presented evidence that providing immunizations beyond the parameters established by the Standing Order is

18

an immediately terminable offense. Notably, though Wal-Mart witnesses stated that Wantou was not terminated solely because he immunized persons outside of the age parameters established by the Standing Order, Wal-Mart also provided extensive evidence of its investigation into Wantou's immunization practices.

Furthermore, the cited evidence more than adequately supports the notion that Wal-Mart's termination decision turned on the fact that Wantou continued to immunize outside of the Standing Order's approved age groups, *even after having been specifically and expressly instructed not to do so*, rather than the mere fact that he already had received a third coaching, such that termination, rather than another coaching, was the indicated next level of discipline. Thus, considering Wantou's behavior—repeated defiance of Wal-Mart's corporate policy, the Standing Order, and management's express directives—a reasonable jury could find that his termination did *not* depend upon the third coaching for purposes of answering Questions 6 and 7.

Additionally, as the district court emphasized, Wantou did not object to the wording of the jury verdict form when it was provided to the jury or the jury's answers upon the return of the jury verdict. Nor, moreover, did Wantou, who bears the burden of proof, seek to include an additional jury question or elicit probative testimony (or other evidence) on this particular point. In other words, Wantou did not ask the persons who decided that he would be terminated whether his discipline would have been only an additional coaching, instead of termination, if he had not already received a third coaching.

Lastly, Question 7 does not dictate that "full back pay" had to be awarded. Rather, it simply asks the sum of money that would fairly and reasonably compensate Wantou for lost wages and benefits, if any, that Wal-Mart was determined to have caused. And, in any event, the parties have not

disputed the district court's determination that it, not the jury, was charged with deciding the actual amount of back pay and front pay, if any, to be awarded. Thus, the final determination regarding the role that retaliation played vis-à-vis Wantou's termination and back pay award was the district court's to make, not the jury's.

Considering the amount of back pay ordered by the court, $5,177.50, and the other factors discussed herein, we find no clear error occurred relative to this finding. Indeed, given Wantou's statement (in closing argument) that he earned an annual salary of approximately $215,000 while employed by Wal-Mart, the jury's advisory verdict of only $32,240 seemingly fails to suggest that the jury was convinced that, but for his third coaching, Wantou would have maintained his employment and annual salary during the three years identified in Question 7.3.

### E. Punitive Damages

A Title VII plaintiff may recover punitive damages upon proof that the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). This is a higher standard than the showing necessary for compensatory damages. *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 534 (1999). Thus, "not every sufficient proof of pretext and discrimination is sufficient proof of malice or reckless indifference." *Hardin v. Caterpillar, Inc.,* 227 F.3d 268, 270 (5th Cir. 2000).

Ultimately, the terms "malice" and "reckless indifference" "focus on the actor's state of mind." *Kolstad*, 527 U.S. at 535. Both "pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination [or retaliatory conduct]." *Id.* Thus, the defendant employer "must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable for punitive

damages." *Id.* at 536. "Moreover, even if particular agents acted with malice or reckless indifference, an employer may avoid vicarious punitive damages liability if it can show" that the agents' actions were contrary to the employer's good-faith efforts to comply with Title VII. *EEOC v. Boh Bros. Constr. Co., L.L.C.,* 731 F.3d 444, 467 (5th Cir. 2013) (citing *Kolstad*, 527 U.S. at 545–46).

The district court denied Wal-Mart's motion seeking judgment as a matter of law regarding punitive damages, concluding Wantou presented evidence that would allow a reasonable jury to conclude that Leeves acted with malice and that Wal-Mart did not exercise good faith. On malice, Leeves made several statements detailing a history of personal conflict with Wantou. Leeves admitted that, before Wantou's third written coaching, these disputes boiled over with raised voices and that she "did get a little defensive." Also, their interactions were "very confrontational." Because the malice inquiry "focus[es] on the actor's state of mind," Leeves "'must at least [have] [retaliated] in the face of a perceived risk that [her] actions w[ould] violate federal law to be liable for punitive damages.'" *Boh Bros. Constr. Co.,* 731 F.3d at 468 (quoting *Kolstad*, 527 U.S. at 535-36). Leeves was trained on Wal-Mart's statement of ethics policy, so she knew not to retaliate against Wantou because of his complaints of discrimination and harassment by his co-workers. Nonetheless, given the evidence of strong personal conflict between Leeves and Wantou, the jury could have reasonably found she did so, and with malice.

Regarding good-faith efforts, Wantou presented evidence from which the jury could conclude that at least certain of his ethics complaints were ignored by Wal-Mart. Even before his third written coaching, Wantou's ethics complaints were regularly demoted to nonethics. When "Wal-Mart failed to respond effectively to [discrimination complaints]," the Fifth Circuit has found sufficient evidence to sustain an award of punitive damages,

despite Wal-Mart encouraging employees to report grievances. *Deffen-baugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 286 (5th Cir. 1999). "For JMOL purposes, the evidence of Wal-Mart's antidiscrimination good faith was certainly not so overwhelming that reasonable jurors could not conclude otherwise." *Id.* A reasonable jury could credit Wantou's version of the facts and reject Wal-Mart's view; the jury, alone, weighs evidence and determines credibility. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

In addition to arguing that no punitive damages are warranted, Wal-Mart contends the district court's award of $5,177.50 in back pay cannot support an award of $75,000.00 in punitive damages. In support of this argument, Wal-Mart cites *Rubinstein v. Administrators of the Tulane Educational Fund*, 218 F.3d 392 (5th Cir. 2000), where the jury awarded $2,500 in compensatory damages plus $75,000 in punitive damages. There, we concluded the award was constitutionally excessive and remitted it to $25,000—10 times the amount of compensatory damages.

In *Abner*, however, we reasoned the statutory cap on punitive damages, coupled with the high threshold for culpability, "confine[d] the amount of the award to a level tolerated by due process." 513 F.3d at 157. And, because Congress "effectively set the tolerable proportion," we reasoned that "the three-factor [*BMW of North America v. Gore*, 517 U.S. 559 (1996)] analysis is relevant only if the statutory cap itself offends due process." *Id.* at 164. Concluding that it did not, and that a ratio-based inquiry became irrelevant, we considered the "sufficiency of evidence [supporting] the statutory threshold [to be] a determinant of constitutional validity." *Id.* Applying that analysis here, we are not convinced, on the instant record, that any reduction of the $75,000 punitive damages award is legally necessary or appropriate.

F. Evidentiary Rulings

Lastly, Wantou protests a number of the district court's evidentiary rulings and limitation of trial time. Again, we emphasize that the applicable query is not whether another judge necessarily would have rendered the same ruling. Rather, it is whether the district court charged with this discretionary duty abused that discretion at the particular time that it was exercised. Considering the record at hand and the parties' submissions, we are not convinced that any of these rulings constitute an abuse of discretion. Nor is apparent that any of these rulings adversely affected any of the parties' substantial rights.

V.

As stated herein, we find no reversible error in the district court rulings challenged on appeal. Accordingly, we AFFIRM.

James C. Ho, *Circuit Judge*, concurring in part and dissenting in part:

Yves Wantou is a pharmacist. But for five of his co-workers at Wal-Mart, all they saw was the color of his skin. According to the summary judgment evidence, his co-workers repeatedly called him a "monkey," a "chimp," "a little African," and an "African fart." They constantly mocked his accent in front of co-workers and customers. And they made numerous comments disparaging Cameroon, Wantou's country of origin, as "Ebola infested," "fly-infested," and a "dirty place." As one co-worker told Wantou: "I see pictures of dirty children from Africa with running nose and flies all over their face all the time. Being from Africa, there is no reason for you to be annoyed by flies. You come from a dirty and fly-infested country."

This evidence establishes a troubling pattern of racial harassment—one that a jury could find sufficiently pervasive to alter the conditions of employment and thereby support a claim of hostile work environment under Title VII of the Civil Rights Act of 1964. *See*, *e.g.*, *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 771 (5th Cir. 2009) ("A workplace environment is hostile when it is 'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'") (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Walker v. Thompson*, 214 F.3d 615, 619–22 (5th Cir. 2000) (plaintiff survives summary judgment where evidence demonstrated use of racial epithets including "little black monkey"); *see also*, *e.g.*, *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182 (4th Cir. 2001) (reversing summary judgment where plaintiff suffered "incessant racial slurs" including "dumb monkey").

But the district court concluded that these incidents, "although allegedly recurring, . . . involved no physical threat," and granted summary judgment to Wal-Mart accordingly.

I strongly disagree with the respected district judge on this point. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris*, 510 U.S. at 21 (cleaned up). And that is precisely what is presented here.

Physical threats or attacks are not required to establish a hostile work environment under Title VII. So the absence of physical threats to go along with the verbal abuse does not prevent this case from proceeding to trial. *See*, *e.g.*, *Walker*, 214 F.3d at 626 ("In the instant case, the district court granted summary judgment, concluding that '[n]one of these comments were physically threatening or humiliating, nor did they unreasonably interfere with Walker and Preston's work. Instead, they were simply truly offensive.' We disagree.").

Accordingly, I would vacate the judgment as to the hostile work environment claim and remand for further proceedings. I would not affirm on alternative grounds not reached by the district court in the first instance, nor addressed by Wantou in his pro se brief on appeal—namely, whether Wal-Mart took prompt remedial action to redress the situation in a manner sufficient to avoid liability under Title VII.[1]

That is an issue that should be decided in the first instance by the district court, if not by a jury. As we've said before, we are a court of review, not first view. Accordingly, I concur in part and dissent in part.

---

[1] According to Wantou, he first informed Wal-Mart in late October 2015 about his hostile work environment—an environment that, according to Wantou, continued to persist through the early summer of 2016, leading up to his termination.